For the defense. Morning, Your Honor. Robert Hirshhorn, State Appellate Defender on behalf of Mr. Sucic. State? Morning, Your Honor. Susan Cheryl Sullivan, Cook County Assistant State's Attorney here on behalf of the people. Each side is approximately 15 minutes, but we don't look at our watches in this division. But it does behoove you to get to your strongest point first. You've raised lots of issues, counsel, but I see a very significant case. So I'd like to hear from you whenever you're ready. Again, good morning, Your Honors. And again, my name is Robert Hirshhorn. I'm with the Office of the State Appellate Defender, and I'm here representing Mr. Sucic. As a prefatory matter, I would like to thank the clerk's office, frankly, for the opportunity to be here today. I have known about that, but for that courtesy, I did want to express my appreciation. I would relate to that. Now, as Your Honor indicated, we've raised several issues in the brief. Some time permitting, I'll address all of them. I'll certainly make every effort to answer any questions Your Honors have, regardless of issue. But first, I'd like to commence with the first issue, the question of the constitutionality of the cyberstalking statute. Now, in this case, the offense here, the cyberstalking offense, was alleged to have occurred on March 13th, 2007. There have been several amendments to the cyberstalking statute since then, I believe two of them. The version that was in effect in 2007 is still in effect now. What has happened is that other definitions of the substantive offense of cyberstalking have been added, and the offense at issue here has been renumbered. I would suggest to Your Honors that one of the things that those amendments tell us is that this is one of those areas where the rapid development of technology is causing a catch-up by the law. The law is, as I'm sure Your Honors were always, to some extent, some step behind technology. And this is an area where the technological development has been so rapid that the effects and the constitutionality kind of get wrapped up in the development of this. We're not talking anymore just about emails. We're talking about Twitter. We're talking about instant messaging. We're talking about emails. We're talking about voicemails. If I ask my children, there are probably several other things that we're talking about that I'm simply unaware of. Now, Mr. Susage was charged with cyberstalking, which requires that the elements are essentially several-fold in the section he's charged under. He has to transmit, on two separate occasions, an electronic communication that harasses the person. It has to be a threat in each of those instances. Now, on its surface, that may seem pretty straightforward. Two instances of communicating a threat by electronic communication that meets the kind of threat that the statute sanctions. But it's not, because what we're dealing with here, and this is, I think, a very important point, this addresses solely the communication. There's really no other physical act involved in this. This statute says if you transmit these threats that harass someone, you have committed cyberstalking. What it does is it sanctions a communication itself. It is the communication, really the communication alone, if it meets the additional requirements that it be a threat, etc., that is at issue. And that's what brings the First Amendment into significance here. That's why we have these First Amendment concerns about this issue. Now, the state is maintaining that these kind of communications are not protected by the First Amendment. And obviously, we are contending the opposite. We are contending that it's at issue here because these are not true threats, as the U.S. Supreme Court has defined them in Black v. Virginia. Well, who decides it's a true threat, counsel? Who's the appropriate tribunal to do that? Us or the Trump? Well, for purposes of constitutionality, I would suggest you are. And, you know, we may get into a different kind of analysis when we're talking about the reasonable doubt arguments. But for purposes of whether this passes constitutional muster, I would strongly suggest it's the NOVA review, and you get the call on that. Are these the kind of things that can be sanctioned, can be criminalized under the First Amendment? The First Amendment, as I said a moment ago, doesn't, it covers and allows the state to prohibit the transmission of true threats. Now, I think the Black case, and it's cited in both our brief and the state's brief, and its progeny are extremely important in understanding how this is Black itself addressed the case of cross-burning. Virginia had criminalized cross-burning. The statute also included a presumption that if you're burning a cross, you intend to intimidate. And what the Black court looked at and said is that, in general, prohibitions on speech violate the First Amendment. There is an exception, however, for true threats. They went through an analysis of cross-burning historically, and they said that this is going to meet the But most significant in that is the way they reached that decision. They focused on the intent of the speaker in what he was doing. Not on how it was perceived by the victim. Not how it was perceived by any recipient of the message. But what did the speaker intend by the communication itself? And this now is important here because now we're going to look at this and we're going to have to judge this when we go through a reasonable doubt analysis in terms of what Mr. Sucich intended when he sent these emails. Well, you see, one, it's subjective. So it's your position that when Mr. Sucich, who testified in this matter, right? Yes, that's correct. Emailed to the alleged victim in this case, I will commit suicide. My life will vanish or I will do a suicide. I will take you with me. Means I will end my life and I am taking you with me. Eye for an eye. There is no moment for mercy. That's not a true threat. I think, Your Honor, when you look at this in the context of the entirety of the message, and for this purpose, I think you can also look at the second email. Mr. Sucich was heartbroken. Mr. Sucich believed he was in a romantic relationship with this woman. Yeah, that's why it's a threat. Generally, yeah, you don't email strangers, I'm going to commit suicide and take you with me. Normally, you would email it to your significant other or what you perceive to be your significant other. Well, you know, it's starting to edge closer to some really bad lyrics from 1970s music in that sense, Your Honor. Well, I don't want to be sending it to a counsel, Frankie, had it been you that had been receiving these threats. The argument is, how is that not a threat? Because it's not serious. And how do we know it's not serious? Because mostly it's idiot. And this is a man who's not a native English speaker. He's Serbian by birth. English is a second language to him. He testified in this case. He testified. Did he say that's an incorrect interpretation? Yes, he did. He said that this wasn't meant. He said it wasn't meant. He didn't say what I just read is not what he said. He admitted saying all that. Yes, Your Honor. Okay, that's not a question of a tape with all Serbian saying, oh, no, the state's interpreter says, yes, I can't wait to cut your head off. And the way I read it is, I love you dearly, I'll give you roses. He admits, those are my words, that's what I told him. The words are admitted, but the meaning, his intent in uttering them, which is why we're starting out here with black. What did he subjectively intend to do? Not so much what Ms. Stern, the alleged victim, perceived as this, but did he intend to convey the threat? Now, all of these, particularly the second email, which is extremely lengthy, talks mostly about if we don't get back together, if you don't come back to me, if we don't have this relationship, if we don't get married and become a family, then I'm going to report you to the federal authorities for insurance fraud. This isn't a man who is frustrated to the point that he wants to do violence. This isn't a man who is trying to tell her he's going to kill her. In reality, this is a man, and frankly, if you look at his testimony, both direct and on cross-examination, the English was there somewhat broken. When you look at this, and even if you look at the emails, it is at times broken English. The sense you get is that he wants her back. He's not intending to kill her. That's exactly what he's talking about. Again, it's not about strangers. It's about people. I want you back with me. I was never with you, or if I was, I don't want to be with you. Well, if you're not with me, I'm going to kill you, which is what he said in the first email. Now, the argument you have is that it's not true threats. Well, I'm going to commit suicide and take you with me. That's when I'm going to kill myself. No rational person could suggest. Well, you can suggest it. That's my job. That's the argument. But no rational person I suggest could believe that when he says, I'm going to commit suicide and take you with me, doesn't mean I'm going to kill you. I'm going to kill myself and you. That's what that means. Well, I would respond to that by saying, let's look at how Heather Stern responded. Did she call the police? No. Did she? What did she do? She responded to the email. She did. Not only did she respond to the email, but when the second email came 90 minutes later, she opened it. But now doesn't that go, counsel, to the reasonable doubt argument as opposed to the reasonable doubt argument as well? You cite Black and rely so far entirely on Black. And we've read the briefs, so I know you don't just rely on Black. But in Black, cited at page 23 of the blue brief, the speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threat and violence will occur. And they talk about intimidation. And that's what this is. Even the second email is clearly intimidating. It's intimidating in the same sense that I'm going to report you to the police for robbing the liquor store. When you talk about the totality of the circumstances, and I'm trying to buy into what you're saying. I appreciate that, Your Honor. How then, how then do you justify that a couple of months before that, that he tried at one occasion, I believe, to break into a house and then some neighbors saw him outside the door of her apartment at some point? If I look at the totality, should I just look at the totality on that March 13th date or the totality of a couple of months around this period of time, all that took place? And what took place before the March 13th that may have led into the March 13th statement? Now, you tell me how much of the totality you want me to look at. Your Honor, I don't think it makes a difference how much of the totality you look at. One thing, as a factual matter, you said breaking in when the neighbors saw him. The neighbors didn't testify that he was breaking in. They used the word harassing the doorknob. The break in, I think, is a different matter. That was something that occurred and that was part of the allegation. January 27th. Yes, I believe that's part of a different charge. February 19th when the neighbors then saw him. Yes. Those are two different events. But, again, if you look at it in terms of whether this gives flavor or color or context to the emails, let's acknowledge at least that if you take that into consideration, he didn't follow through on it. But you don't need to. I mean, you look at the case of discussing Truth Threat Counsel, like U.S. v. Parr, here's an inmate in a federal institution or in prison saying, they're very unhappy people in my experience, he's very unhappy and he's saying, I'm going to blow up a federal building. Well, he's in a cage. You know, he's going to be in a cage for however long he's going to be in a cage. And they found that to be a truth threat. He had no ability whatever to blow up a federal building. Certainly no immediate ability, but there was also testimony, I believe it was from the cellmate who turned him in, to accept that he was going to wait a while. He was going to do this maybe as a 50th birthday present to himself. In that case, he indicated much more of a plan, how he was going to do it. There was evidence there that he had. You don't need much of a plan with suicide, do you? The classics talking is, I'm going to say, I'm not all that serious about suicide. They're pretty simple. There's not a lot of planning involved. It's kind of the opposite. Well, but the fact is that in Parr there was evidence of that plan. They had the anarchist handbook or cookbook, I can't remember the term for it. There was a description of how he was going to make the bomb. There was testimony from neighbors to the extent that as a kid he loved putting things together to blow them up. All that was measured there in terms of the true threat, and they found that to be a true threat. When you look at this, when you look at the surrounding circumstances, which Your Honor referred to, should I look at these other incidents, these other episodes, if you do, you see an inability to consummate anything against her. He had, according to her, eavesdropped from the hallway on her phone calls, yet not once is there any indication that he ever goes in. This is a guy that's just against the law. And, Frankie, having been on the Curtis case cited by the state, it's against the law to be in front of your ex-girlfriend. Theoretically, you're seeing her leave another's house. You can't do that. Now, in that case, there was an order of protection. That was an order of protection that also had to do with a stalking statute rather than a cyber-stalking statute. Well, why would it be different? In terms of the he's outside the door and her tires get flat, which he then says, that's a separate physical act that's not required under cyber-stalking. Because cyber-stalking, for First Amendment purposes, again, we're talking strictly about the communication. Thou shalt not communicate in this fashion. And excuse me, Counsel, you're saying that the communication, because it's just a communication that for some reason that's overreaching and that's unconstitutional? Because it focuses strictly on the communication and because we maintain it's not a true threat. If this was a true threat, if it was the kind of evidence that they had in part, indicating that this man had not only said this but intended to follow through on it, had made plans, had taken additional actions in order to achieve that end, then I think we could classify it as a true threat. But we're not seeing that. So, Counsel, you're saying that if someone had called, if it was a telephone call, and several telephone calls were made to this woman under the same circumstances, and the caller kept saying, you know what, you have ruined my life, you have broken my heart, I'm going to kill myself, I'm going to kill you too, would that be protected? Or would that be harassment? Again, this is one where, frankly, the more often it happens, the less threatening it becomes. It becomes a nuisance after a while. Counsel, with all due respect, I think if it was happening to you or somebody in your family, you might not say that. However, it is harassment. We're not asking that the person be guilty of actually carrying through. The statutes are harassment. I mean, it's the act of continuing to call and continuing to make these horrible statements to people. Now, is there a difference between cyber communication and a telephone communication of the same type? I think a telephone communication fits the definition of cyber communication, as I understand it, by any electronic media. What about face-to-face? Face-to-face, you're not going to get into cyber stalking. You're not dealing with cyberspace anymore. But what about the communications? You're saying it's just a communication. One is typed out, one is said over the phone, one is face-to-face. Without any action happening, what's going to happen? At that point, frankly, I think you could argue then that what we're dealing with is an assault. It's all communication, Counsel, based on your argument. It's all communication. And whether or not it is protected by the First Amendment or not, I would suggest, Your Honor, is going to be determined by whether this is, based on the speaker's intent, under black, and as construed in par, whether there is any truth, whether this is just puffing, whether this is just someone in frustration bloviating to someone. You've hurt me. I want to get even. I'm just talking. I'm venting. If it's just venting, it's probably not a true threat, and we can't get to it. If it goes beyond that, then, yeah, I think you get to it. If you're venting, Counsel, in a closed room or in the privacy of your own home and that person has no way of hearing or seeing what you're venting is, you're right. It's just venting. When you're venting crosses into someone else who is the target of that venting hearing it or seeing it on email, then you're crossing into an area where you are causing some type of harm or effect on that person. Would you agree? I would direct, Your Honor, to Ms. Stern's reaction, certainly to the first one. And her reaction is that it required a response, right? Yeah, she responded to it. She emailed back. Then it did affect her. What I'm suggesting is she didn't even perceive it as a threat. Because she responded? Because she responded calmly, rationally, basically saying, stop this. She didn't call the police. She said, stop this. And then there was a second email. There was, I believe, a voicemail message in between and then a second email. And then a second email. And then the statute actually states it has to be at least two. And the second one, the threat. Again, look at this in context of the entirety of the email. Give it some context here. Really, the threat, if there is a threat in the second email, you've killed me, past tense. He's obviously not dead there. But putting aside the tense here. You murdered me. That's not good for the receiver, right? I'm telling you, you killed me.  It's incredibly foolish not to take people like this very seriously, whether you receive it or not. It's very serious. Going back to your point, he was actually threatened here with the police. A case not cited by the party, nobody's fault. From last year, People v. Cardamone, a DuPage County case. A fellow was charged with molesting dozens of children. I believe I saw something in the papers about that. It's unbelievable. If it happened, I have no idea. He's out of mind. But he was also convicted of witness harassment for calling the police on the mother of one of those children. And Cardamone is at the 232 Illinois 2nd, looks like 504. And they held a 911 call alleging the mother of one of the witnesses against him was drunk driving. He got three years in prison for that. And the Supreme Court said, yeah, that's right. You can't. So even though theoretically you take the look at it, as you have to do, that he's really just threatening her with, you know, she committed a crime, she'll do her time. That can also be considered witness harassment. Well, without having read Cardamone in preparation for this, I'm a little bit at sea. But let me just say that when you're addressing a witness, frankly, in order to analyze it, I need to know what specifically he said and whether there was any evidence that this threat had a basis in fact or not. Because what Mr. Susich has alleged to have threatened is to report her to federal authorities for insurance fraud. There's no finding in this record by the trial court as to whether there was a basis for it or not. Obviously, he testified. Why would you need a basis for it? Why would you need a basis for it? Because if the threat is I'm going to do my duty as a citizen and report what I think is a crime, I think that we ought to have some policy concerns if we're going to put an impediment against citizens reporting crimes. Well, actually, the vast majority of extortions are that. The vast majority of extortions are I'm going to make something up about you. It's going to be I know you did this, and you give me a lot of money. I'll keep quiet about it. I think it's different for purposes of Cardamone as to whether or not there was any truth to it, and I think that it's different for purposes of our cyberstalk and whether this is a true threat. But then you get into the idea of a mini-trial as to whether or not the victim in this case was indeed skimming your insurance company or not. I don't think they had a mini-trial in Cardamone to see if the lady was a drunk driver or not. Go ahead. Again, without knowing the specific facts in Cardamone, I'm a little bit hesitant to respond. Why don't you move on to your next point. Okay. Again, just to wind up the point about true threats and how that fits in here, the claim I'll kill myself and I'll take you with me, and the second one that she killed his heart and he will get even, where all the context here of those specific messages, particularly the second lengthy one, revolved around the insurance fraud allegation. And here's your chance. I'll make a deal with you. Marry me. We'll be a family. This won't happen, but if you don't, three to five years. This isn't a man who wants to kill her. This shouldn't be taken as a true threat when you put all of this in the context of everything else that was said in that message. Well, in the second message at the very end, I am so desperate I do not mind dying as of now. Try me. Kill her. I don't know. Say the threat to me. Frankly, particularly in light of what immediately precedes that, I will have no mercy on you just as you're showing me no mercy. If you're not going to get back together with me, then I'm going to report this to the federal authorities. You're going to do time. You won't see your son while you're in jail. How is that not a threat? I don't think it's a threat within the meaning of black where the alleged threat is to do your duty as a citizen, report what you believe is a crime. Turning on to one, I believe we touched on this briefly before, but one other thing. I know the state put a great deal of emphasis on Bailey and Coyne, the case from the Illinois Supreme Court, which upheld the stalking statute against similar challenges. And, again, the point I think that needs to be made here is that in the stalking context, it is the threat to the citizenship, which gives color to another physical act, surveillance, following, showing up at the place of work, showing up at residence, showing up at some other place that you know to be occupied. The threat gives color to the physical actions, but here we don't have those physical actions. Here we're dealing with just the threat, and I think that makes it different for purposes of the First Amendment analysis here. Of course, in this case, we do have physical actions. It's just not required by the statute. It's not required by the statute. And when you say actions in the context of these specific threats because Well, he went to her home on two occasions. One, trying to force his way in the closed door. And that was subject of the stalking. And the second time, when he's cresting the door, he calls her back and says, by the way, when I wasn't able to, I flattened your tires during that same visit. I would suggest those are two physical acts. Those are physical acts, but that's not what he's charged with. Those aren't the physical acts he's charged with. He's charged with cyber-stalking based on these two emails. Right, because you don't need a physical act in cyber-stalking. No, you don't, but I'm saying for First Amendment purposes, we're dealing with pure communication now, which in the context of just the stalking statute, we're not. But then you get to the argument from the state is, when you're trying to strike down the whole statute, you have to then say that there are no circumstances under which this could apply. And certainly you don't have that. So if you're going to then strike it as being overbroad, well, now you can go into saying, well, you look at your own facts. And on your own facts, the effects here are extremely aggravating. There's a lot more here than just the cyber-stalking, than just any allegation on First Amendment. And he was separately convicted of the stalking. Right. I mean, if you're implying that the stalking is part of the cyber-stalking, then I would suggest to you maybe we've got a whole different one. No, nobody argued it because it's not true. Go ahead, Gus. Okay. Turning to the reasonable doubt argument on the cyber-stalking, we've challenged the evidence on three separate grounds. Inadequate proof that Mr. Susich knowingly transmitted a threat. That basically is the same argument that we were talking about previously. I won't go through it again. The second, that the threats were of immediate or future harm, which is, again, one of the elements as it's defined in this specific section of the cyber-stalking statute. And I would, again, suggest to you that there's no evidence here on which we can say that these were threats that she received that she could perceive as future harm. She didn't react that way.  She opened the e-mail. She recognized the e-mail address. She testified that she knew who the e-mails were from. Right. And yet rather than delete them, rather than set a spam filter not to let them through, she keeps reading them. This is not a woman who feels that she's in any kind of threat of bodily harm. So we would contend that on that, again. Excuse me, counsel. You're saying the fact that she reads them means she doesn't feel threatened? No, I'm suggesting that as long as we're going to the surrounding circumstances, what Justice Steele talked about, I think the term you used was all of the. Totality of the circumstances. Totality of the circumstances, everything surrounding this. When we're looking at that, then at that point we ought to at least consider how she reacted as well. Well, then let's also consider after receiving the second e-mail, the defendant left her a voicemail message. And in that message he says, I'm dead. I'm a dead person without you, your son. So I'll take you with me. I need you with me in heaven. Okay? Want to add that to the totality? If you add that to the totality. Then you've got a problem. No, I'm not trying to be flippant when I say this, Your Honor. But I think when you add that to the totality, we really are getting back to really bad song lyrics at that point. This is not fair. Counsel, you know, with all due respect, I would suggest you not make that argument again. Okay. Okay, because. I'm not trying to minimize it, Your Honor. And I understand you're not trying to minimize it, but such phraseology, I'm certain, has had devastating effects in other situations. And so let's move on from that. Okay, certainly, Your Honor. And I apologize if there was any offense in that. I certainly didn't intend that. Thank you, Ken. The final basis that we challenge on it is that was there any evidence that she was in any way tormented, alarmed, or terrorized? And I know for purposes of the constitutionality, the State used a term, and I'm going to do violence to the pronunciation of it, nocier associas, I think. Nociter associas. That the words give meaning, each word gives meaning to the surrounding terms. That does, in some sense, touch on our vagueness argument, because if you have to get to the surrounding words, and this is ambiguous virtually by definition, that doctrine isn't even triggered unless you get some ambiguity in the statute. But turning to the reasonable doubt here, really this, I don't know how they can define each other, because rather than giving flavor to each other, they define the entire spectrum. I can be alarmed if someone in a car behind me beeps. That doesn't make cyber-stalking. Alarmed is kind of de minimis terrorized, the opposite end of the spectrum. But again, when we look at the facts here, when we look at what he did, what he intended, and he testified that he didn't intend that seriously, that this was just idiom. I believe he used other terms to describe what he meant by that. Basically, he meant that metaphorically. And the trial court was allowed to disregard it, to say, I didn't take it that way. I find that you didn't think it was just a metaphysical thing when I said I was going to kill myself and you. The judge is correct. He's the finder of fact. This is getting back to, I think, your very first question. He's the finder of fact, and there is some deference there. But let's look at the evidence. Again, I emphasize to you that she didn't react alarmed. There's nothing in her conduct which suggests that. And therefore, on what basis do we reject his statement that he meant it metaphorically? English is not his first language. This is an idiom. Idioms are probably the last thing that non-English speakers pick up. But then you go back to what actually happened, as opposed to what could have happened, what could be said with the several examples in the brief. What was said is, I'm going to kill myself and you. That's pretty good. I don't know how much more you could have in terms of if you were to write a script for his talking. That's probably dead on. If you were to do a law school review, or at least I should say a strong case, that would be it. The second email that goes on, we're talking about confining her in prison. Confinement is one of the elements, but normally you wouldn't think it would be in prison. It does mean that you're out. But there are other phone calls, too. Turning from the cyber-stalking to the stalking, there's one other thing that really affects the stalking, as opposed to the cyber-stalking, for purposes of reasonable doubt. Again, the indictment, as it should be, is very specific as to what are the two episodes it's talking about. One of the episodes is what Justice Steele referred to, when the two neighbors saw him on the landing between their doors caressing the frame and the doorknob. There is no evidence in this record that she was in the apartment at the time or knew about it. Now, in their brief, although the indictment speaks in terms of following or surveilling, in their brief the state concedes that this is more properly analyzed as surveillance. I don't think you can surveil someone who's not there. Well, he certainly thought she was there because he was knocking on the door. So he wouldn't have knocked on the door if he didn't think she was there. It would also indicate that she was there when her car was there to have the tires slammed. Again, Your Honor, there's no testimony in this record that the flattening of the tires was part of the same course of conduct. It happened the same day. It could have happened that morning. It could have happened later in the evening. There's no indication that. . . What difference would it make? Because he's still going to her house to do damage. I mean, I don't know how it would help you. Because the indictment doesn't say that that's the act, the flattening of the tires. But the statute itself requires, particularly based on the state's concession in their brief, that this should be analyzed as surveillance, that she be there. You can't surveil someone who's not there. Actually, to be honest, maybe we should. Because, again, having been on Curtis, you can't go to their places of employment, can't go to their places where they live. So if they happen to not be home while you're sitting outside with binoculars looking in their front window, that would not, under your argument, be violative of anything. Well, if you're watching them at home, then you're surveilling them. Not if they're home. I'm sitting, I park my car in front of this lady's house who doesn't want anything to do with me, and I sit there all day long. And that would be okay until she gets home. So what would be determinative under your argument would be whether or not she was home to see me surveilling. Rather than me sitting up, or in his case, leaning up against her door would be okay. Not an objectionable act, not a criminal act. So having his hand on the lady's door would be okay. I would suggest, Your Honor, that if that were the case, then that's going to require legislative action. Because the legislature used some terms in there in the stalking statute when they talked about her place of work, her residence, the residence of another. It's all tied together, I believe, with the words occupied. I would suggest, Your Honor, that the legislature, if that was the legislature's intent, the legislature ought to make that more manifest than it did. Go ahead. Do you want to wrap it up, too? Sure. I just want to touch on the crankle issue at least, Your Honor. Yes. Because I think that, again, is somewhat critical here. And the one-act-one crime. We won't prevent you, but do those both quickly. Okay. With regard to the crankle issue, Your Honor, we divided it up into actions prior to trial and actions after trial. It's clear that he filed a pro se motion after trial alleging ineffectiveness and alleging a laundry list of defects. I think when you look at the record, when you look at what actually happened at the sentencing hearing, the trial judge said something to the effect, I've got two motions. Counsel, you want to argue yours? She says no. And he then says, motion denied. He never makes inquiry. The only time there's anything at that hearing that even approaches inquiry is during the sentencing portion of the hearing. But the only thing that's discussed at that point is the allegation that there was some kind of plea negotiation, where counsel says, you know, there was a misunderstanding on a plea negotiation. Before a judge can deny a pro se post-trial motion, he's got a duty to make inquiry, to find out the substance of what these allegations are. We're dealing with a pro se litigant. It's not going to be perfect. But before the judge can rule and say, I'm not going to give you an attorney to argue these issues for you, he's got to make some kind of inquiry. He's got to know what issues he's rejecting. This is the way that he has to written a statement of Mr. Zubchik complaining he's misled about discovery and testimony. I don't know how that happens. I don't know how that would be pertinent. The question is ineffective for not answering the dozens of questions that the alleged stalker gave to his lawyer to ask the stalkee. Okay. It's one of them. Counsel didn't bring witnesses without saying who the witnesses were. Failed to stipulate improper evidence presented. Now, the stipulation in this case were from whose e-mail account it was sent from. And as to interpretation, there were no other stipulations I could see. Yes, that's correct. So what more could the trial court care about, Frankie, than, all right, they stipulated two foreign interpreters, both sides. He didn't want an interpreter. He didn't need an interpreter. And whose e-mail account it was. How is that objectionable? As to the stipulation, I don't know, Your Honor. But what I'm suggesting is to some of these, the judge would have no basis to know whether there was the gist of a claim, more of a claim, whether there was something that he needed. Is that the standard gist of a claim? That's the standard on pro se filings and post-conviction petitions. And I realize that. And I realize, you know, I just changed that a little bit, too. Why don't you get to one act, one crime. Okay. One act, one crime is very simple, Your Honor. The cyberstalking alleged two e-mails. One of them is alleged in the electronic harassment. It's the same act, the exact same act. You can't have both of them. In virtually every sense that I can gather, it's an included offense. And both can't stand. Thank you. You'll have time for rebuttal. Thank you, Your Honor. State, Ms. Sullivan. Good morning, Your Honors. Good morning. Defendant was convicted for cyberstalking, stalking and harassment through electronic communication. There's a lot of talk, defense counsel's argument kind of, and the court kind of took him straight into an as-applied conversation right away. I want to back up a little bit on the First Amendment context and cover the facial part, if that's okay with the court. And then I'll move to the as-applied. I'm going to skip the vagueness unless this Court has any questions. I'm going to skip King unless it has any questions. I'm going to deal with sufficiency and then Krankel. This time the one act, one crime. I would point out that less than a month ago our Supreme Court Nunez again held that one act, one crime issues are subject to plain error analysis under the second prong. So they're not waived. Go ahead. Okay. Is there a substantive concern about the one act? Because there are multiple acts and there's no greater or lesser relationship between any of those. And I laid that out in my brief. You should. Okay. So First Amendment challenge. The starting point really for everyone here isn't in dispute. Threats to commit violence or physical harm are categorically excluded from the reach, the protections of the First Amendment. No one really disagrees about that. And, Your Honor, as you put it out, just because it's speech and even just because it's content-based speech isn't constitutionally unique. Doctrines like fighting words, defamation, child pornography, these are all other examples of pure speech categorically excluded from the First Amendment protections. Here we're talking about another category, the threats of violence or physical harm. They're excluded precisely because they do not further any First Amendment values. In my brief on page 28, I laid out a whole host of other cases, mostly out of Illinois, some federal, some state, where there's other threat-based statutes that were upheld, just as I'd like this Court to do, on precisely this rationale. That includes stalking. That includes child luring. Car pulls up, tries to lure a kid in. Pure speech. It includes intimidation. Extortion, as Your Honor pointed out. A whole host, a whole host of verbal crimes. That doesn't make it something that we have to immediately say, that's a First Amendment problem. We have to look at whether or not it's categorically excluded. And in this case, this is a true threat scenario, categorically excluded from the First Amendment. The defendant, though, says that this statute sweeps too broadly. He says it's constitutionally overbroad. No, doctrinally, just to make sure, just to clear up, just because someone raises some problematic hypotheticals under the doctrine of overbreath, that's not necessarily going to bring about a facial striking of a statute. Doctrinally, within overbreath analysis, we handle these kind of fringe scenarios, these kind of hypotheticals on a case-by-case basis. We handle it through jury instructions. We handle it through proof beyond a reasonable doubt. We handle it through, as we are in this case with this particular defendant, an as-applied kind of conversation. The statute may well be, as we saw in Watts, facially perfectly constitutional, but you may well have an as-applied problem under the particular facts of the case. And really, that's what the bulk of defendant's argument is about. He can't use his as-applied claims. His, well, there's not enough proof that I intended it. Those kind of arguments that he makes throughout his brief and that he was up here making today. He can't use those proof-based arguments to affect a facial striking of this statute. We have to go through the facial, the substantial overbreath analysis in order to come to that conclusion or not come to that conclusion. So, to warrant facially striking the statute, the overbreath must not only be real, it must be substantial as well. And substantial means both in absolute terms and also relative to the statute's plainly legitimate sweep. To determine if it sweeps too far, we have to construe the statute. We have to look at what the statute covers in order to decide whether or not it's overbreath. So, that's what I'd like to do. And along the way, as we're discussing the statute, I'm going to handle the hypotheticals that defendant raises in his facial challenge. I'm going to handle them and point out where the mechanics of the statute itself cover those hypotheticals, cover those, assuage those potential concerns that defendant raises. First of all, to commit cyber-stalking, one has to knowingly and without lawful authority. That's the first thing, the scienter. Right there, right off the bat, we get rid of any sort of WIC, Zaremba, kinds of innocent conduct concerns in Illinois because we have, this is actually the mens rea that the Bailey court wrote into the stalking that WIC and Zaremba said were missing from the Ag Arson statutes and those in that line of cases. We have that in this case. Not only do we have it, we have this scienter, this mens rea moving all the way down each and every element in the offense. Next, on at least two separate occasions, we have to have two separate occasions. It's not just this sort of common firing off an angry email concern that defendant raises. That's not going to run afoul of the statute. We have sort of repetitive nature written into the statute to accommodate that kind of concern. Next, we have harasses another person through the use of electronic communication. And that's defined in the statute. Engage in a course of conduct that alarms, torments, or terrorizes that person. Looking at this, we have, on the one end, we have the state of mind, the relevance, the state of mind of the recipient component built into the statute on the one end. In conjunction, on the other end, we have the transmits a threat of immediate, that's an immediacy concern he raises, or future bodily harm. Now, we have the mens rea. It's not just an unintended threat that he talks about. It's not hyperbole. It's not any of those kind of sorts of concerns that he raises because of these two in conjunction, the statute working all together, and the mens rea, the scienter, working all the way down for all the elements. Now, specifically, just to address the very specifics of a lot of the hypotheticals he raises, these last two, the state of mind of the victim, this alarm, torment, terrorizes, combined with this mens rea, this knowing without lawful authority, transmission of a threat, these two combined obviate the bulk of defendant's remaining concerns. Practical joke, hyperbole, the colloquialisms he talks about. He's a non-native speaker. There's other non-native speakers. Those kind of concerns, in addition to, he raises the halfway around the world, the logistical feasibility question he raises, unopened or spam caught in the spam filter, all of these kind of hypotheticals are accommodated within the statute, within the mechanics of the statute itself. Now to the constitutional definition of a true threat, a serious expression of intent to commit an act of unlawful violence to a particular individual or group of individuals. Defendant said several times, well, he's incapable of coming to fruition. The threats he made in this email, he was incapable of effecting. Under the constitutional doctrine, the speaker need not actually intend, intend to, or even be able to carry out the threat itself. Those are the constitutional parameters of the true threat doctrine. So when defendant suggests in his brief and the intimated during argument that there's a distinction between these anti-threat statutes and the inchoate, the inchoate, the attempts, the solicitations, those kind of things, in that there's no specific intent to commit the predicate, it doesn't matter. It doesn't matter under the First Amendment, under the true threat doctrine what we're talking about. It's constitutionally irrelevant because, as I said, the true threat constitutionally need not actually intend to or be able to carry out the threat. And Justice Quinn, that's what you were talking about in the Parr case. He's in jail. He's locked up. How's he going to blow up the federal building? In what? You know, the conversation that the 1946 case, the paradigmatic as applied case, that statute doesn't even require that it gets communicated to the president, first of all, that it be a felony punishable threat. But in addition to that, the threat in and of itself, that was the beginning and end of it. The inchoate component that defendant raises, it doesn't make it unconstitutional. So looking at the mechanics, the hypotheticals raised, combining it with the constitutional parameters, the doctrine of true threat, what we really have actually in our cyberstalking statute, it protects more speech than is constitutionally required. It sweeps less broad than it actually constitutionally could. So it's not substantially overbroad. And as a result, it can't be facially stricken on these grounds. Briefly, just a brief comment about something that defendant raised in terms of what my argument was with respect to the facial as applied relationship. It's not my argument. And if I communicated it sort of poorly in the brief, I apologize. But here's my argument on that. It's not that the facial and the as applied claims that defendant raises are not constitutionally viable. That's not my argument. It's just that. What defendant's really raising here, the bulk of what he's raising is an as applied argument. He can't get the facial remedy. At best, he can only get his conviction reversed. And I'm going to talk about that. I don't think his conviction should be reversed. I don't think he's satisfied the as applied. But he can't use the as applied proof kind of arguments that's throughout his brief to affect the facial striking of the statute. That's, again, what Watts shows us. Watts says right up front, facially it's fine. I'm going to put the rifle to LBJ's head, the Watts case, because he doesn't want to go to the Vietnam War. Right up front they say, facially, it's fine. It's perfectly fine. As applied, it's political hyperbole. Notably, in that case, and this kind of takes me into the conversation about context that your Honor raised. In that case, they relied on the context. You can't evaluate. In any case, you can't evaluate what we have here, intent, state of mind. You can't evaluate them outside of the context in which they're uttered. And also, all of that other stuff provides circumstantial evidence to those elements. We're required to prove intent. We're required to prove victim's state of mind. We're definitely permitted to rely on all this other kind of circumstantial evidence, contextual. There's nothing unique about the cyber-stalking statute that's going to take it out of the realm of all the other cases that we try in the criminal courts. Okay. Now, I'm going to move then to the as applied, the cyber-stalking. And I'm going to – To remind you, we gave them half an hour. Am I – No, no, no, no. You spent about 15 minutes on facial. Okay. So if you've got four more to go, that won't do. Okay. I'll move to as applied. Defendant essentially contests that, the bulk of his argument are, that the two emails, the March 13th emails, were not threats and that the victim wasn't alarmed, tormented, or terrorized. Okay. Preliminary comment about the mechanics of this statute. Knowingly and without lawful justification, on at least two separate occasions, one person harasses another. And that's defined engaged in coercive conduct that alarms, torments, or terrorizes a person. And at any time transmits a threat. This is patterned after the stalking statute. There's only one threat required in this statute. We have two, and I'm going to talk about two. But the statute only requires one. It requires two courses of conduct, one threat. Okay. What are those two separate occasions? Two separate, I didn't hear you, Your Honor. Two separate occasions. Two, it's defined as, on at least two separate occasions, harasses, and then you move to the definition of harass, and it means willful course of conduct directed at. And then, and transmits a threat. I respond to counsel's statement that thinks it's important that there was a response by the alleged victim in this case to the email. Okay. First of all, the email response that the victim made isn't in evidence in this case. The victim started to read it, prosecutor objected, and the trial court struck it. So it's really not even evidence.  Any time a victim responds to a defendant and tries to talk them off a ledge, tries to respond rationally, you know, a guy has, a crack addict has a gun to your head, a person's head, and you try and talk them down, talk them rationally, just because that kind of rational response is the way you decide to go about handling the situation, doesn't mean you're not alarmed, tormented, or terrorized. And that's my, and also, he also says, well, she didn't call the police. She didn't call the police right away. She couldn't have been terrorized. She couldn't have been alarmed. Rape victims don't always call the police. Are we going to say they weren't raped because they didn't call the police? That's an argument. Well, I mean, that is an argument. You don't have a lot to argue, I mean. That children don't necessarily, I mean, children don't necessarily come forward when bad things happen to them. It's a circumstantial argument that we can debate, but it's definitely not necessarily, well, she didn't, therefore, she wasn't terrorized. It's an argument. To argue circumstantially, it would cut against the argument that she was terrorized when she read it and then read the others as well. And I don't know how that could be not agreed with in the sense it does cut against the argument. I would argue that it actually does, it is actually neutral at best, Your Honor, because what she's doing, she knows the guy. She knows him. She's just trying the first response to say, you know, to just calm him down, to back him off. Then when he continues, he escalates, she goes to the police. Okay. Now, moving then to the threat. Defendants are not threats. And it talks about the context. The whole entirety of the context is relevant. We're talking about state of mind of the victim. Viewed in context of defendant's increasingly desperate, bizarre, controlling behavior, both of these emails contain threats. And they're both subjectively and objectively intended by a defendant. Defendant says, one of the arguments that he makes is that they're self-negating. He makes that in the reply brief. He says, well, you can't simultaneously kill yourself and then bring someone to the insurance company. They're self-negating. They can't be real threats. Well, if you really look at the, if you look at the, especially the first one, if you look at it, they're really kind of either-or propositions. He's basically saying either you, victim, accept my blackmail through insurance fraud marriage proposal or I'm going to commit suicide and take you out with me. We talked a lot about the various words that he used, about all the words that are contained. And I think, Your Honor, actually the real telling one is that last follow-up phone call after the second one. That one, there's really no way that you can dispute that those are definitely really intended and really true threats. And how about the second? First one, too. He's saying, please, think what you are doing while I'm in a problem with future. I will commit suicide. My life will vanish or I will do a suicide and I will take you with me. It means I will end my life. You just said that. Move on to the second one. It couldn't be stronger. Your case on the first threat couldn't be stronger. We said earlier it couldn't be stronger. Okay. How about the second one? Before I go to drain, I'll make all people pay. You are the one that should pay most. You are the one that my life went to drain for. I am so desperate. I am not joking. You killed my heart. I will get even. You have destroyed my life and no mercy for you. You've killed me. Did you not expect I will get back anyway or God? I am so desperate. I do not mind dying as of now. Try me, killer. Those are words of threats. Then followed up with the phone call. You fucked up my life. I look like a shadow. You do not answer me. This is just payback and I'm going to be vanished. I'm in the grave already, one foot in the grave, so I don't give a fuck. I'm dying anyways. I'm dead. I'm a dead person without you and Aidan. So I will take you with me because I need you with me in heaven, okay? You're coming out with me. You're coming the fuck out with me. You can send the cops on me how many times. How are they going to find me? I'm going to kill a fucking every spirit that's killed myself. Those are words of threats. Pretty clear expression, subjective and objective threat of immediate or future bodily harm. Defendant says there's no immediacy in here. If you take a look at the second email, he basically gives her 24 hours to decide either our proposition and the urgent content, the email, the phone call. Look at my email. All of that indicates the immediacy. Before I run out of time, I do want to talk very quickly about this argument that defendant makes with respect to the surveillance element in the stalking statute. This is a new argument. It wasn't in the opening brief. I'm not complaining, but I do want an opportunity to respond to it. This is the first time we saw it. They shifted counsel. One counsel did the opening. The new counsel did the reply. And this is the first time this statutory construction argument found in it. There actually is evidence. Even if we agree that it's supposed to be construed the way defendant says, there actually is evidence in the record that she was in the apartment during that door caressing incident. Defendant himself testified that he went to the victim's home then because she invited him. She invited him. She called him up and said, come over. And as Your Honor pointed out, why is he at the door? She invited him circumstantially because she's there. 930 at night. She's got a six-year-old autistic son. Her car is there. We know that because he slashed the tires. Again, more circumstantial evidence. Also, defendant, right before he's finally leaving, the second time he comes back and he's having this exchange with the male neighbor, the neighbor says, you better get out of here. I'm calling the police. Right before he leaves, points to the door. He says, she's practicing witchcraft. Again, circumstantial evidence. How does he know? There's got to be some audible, some kind of something for him to know. How does he know she's practicing witchcraft if she's not in there? Again, not definitively, but it's all circumstantial evidence. So to suggest that there's no evidence in the record is not true. Also, the construction that he puts on it, it defies the rules of punctuation and grammar. He says. I don't want to hear about grammar. No, no, no. I'm not going to go into the grammar lesson. This is significant because he says, at the end of the laundry list of places where she could be surveilled, there's other place occupied by the person. That's the only phrase within all of these phrases that has occupied by the person. According to the defendant, occupied by the person, statutorily, amends all the other places. Her school, her home, her place of employment. That's not how, that's not statutory construction proper. And that's what I mean by, I'm not going to go into the rules, but that defies punctuation and grammar. And that's one of our rules of statutory construction. It also goes against the statute's purpose. Purpose really is to stop the violence, the physical violence, before it begins. And in part, they do it by identifying the obsessive precursors that stalkers go into before violence. The paradigmatic lying in wait, as Your Honor pointed out. Hasting the victim's whereabouts. Whether or not she's there, by the way. It's something less scary if her neighbor says, by the way, he was here stalking you again, than if she's unbeknownst in the house. So, to construe it that it's only surveillance if she's present, goes against its purpose. And finally, there is existing case law on this. And that is, People v. Krawiec, and I'm not sure how to pronounce, K-R-A-W-I-E-C, 262-113-152, and that's out of the 2nd District, 1994. They actually address the statutory construction issue in the context of the stalking statute. Briefly, Crankle, I never conceded that the pretrial Crankle is legitimate. Our office is currently litigating that in the Illinois Supreme Court right now under Jockle. That's the case defendant relies on in his brief. And that's number 108465. It's still in the briefing stages. Given the page limitations, I just handled that argument the best that I could, but by no means have I conceded that Crankle applies pretrial. And also, I think the defendant misspoke. With respect to the post-trial, the pro se post-trial motion that defendant submitted, the trial court didn't just ignore it. He specifically said, I read both of them. Defense counsel turned in one. Defendant himself turned in one. Trial court said, I read them both. I want to talk specifically about this plea question. That's the only thing that he saw. He did his inquiry. That's the only thing that wasn't within his purview, his knowledge. Then he had to do further inquiry.  Thank you, Your Honor. We would ask that you affirm that conviction. Mr. Hirshhorn, briefly. I make every effort, Your Honor. I think you've already overindulged me. Just a couple of points. When counsel talks about the mechanics of this, that the statute itself has the mechanics to answer all that, I would just point out to Your Honor that for the purpose of the constitutional issue, again, we're focusing here on the application of a subjective test. So if we're going to look at it in this mechanical fashion, we have to look at it in this mechanical fashion as to what Mr. Susage intended. And what's your best case? Is there a case other than Black that you can really rely upon for the idea of it being a subjective test? I think you can cite one in your brief. Frankly, I mean the speaker has to really intend to do it, even though in Black itself there's a contrary language. Any other cases that would go along with your theory on that? Parr is the one, I think, that is closest to it, Your Honor. Okay. Just a couple of other points. Once, I think counsel suggested, and I'm not certain I heard this correctly, that when she responded to the e-mail, that was something that was elicited by the defense counsel. That actually was elicited by the state's attorney. The state's attorney elicited something to the effect of she responded by telling him to stop this, that she couldn't have cheated on him since they didn't have a relationship in the first place. And that was elicited by the state, not by defense counsel. And finally, the point that they only need one threat. Again, as I read the statute and as I construe the statute, the statute talks about harass, and harass talks about alarms, torments, terrorizes. I think it's got to be a threat in both of them. Just two separate occasions. Yeah. Thank you. Unless there are any other questions, I thank Your Honor for the time. The argument is in the briefs, so this case will be taken in our advisement, and this court will be in recess.